HOFHEIMER GARTLIR & GROSS, LLP
Counsel for the Debtor and Debtor in Possession
530 Fifth Avenue
New York, NY 10036
(212) 818-9000
Scott R. Kipnis (SK-9147)
Douglas Gross (DG-5984)
Nicholas B. Malito (NM-3216)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

In re                                                                      Chapter 11

1633 Broadway Mars Restaurant Corp.                     Case No.: 07-14062 (ALG)

                              Debtor.
-----------------------------------------------------------X


**OPPOSITION TO THE MOTION TO DISMISS
DEBTOR'S BANKRUPTCY CASE AND FOR RELATED RELIEF
OF LANDLORD PARAMOUNT GROUP, INC.,
<u>AS AGENT FOR PGREF I, 1633 BROADWAY TOWER L.P.</u>**


     Debtor 1633 Broadway Mars Restaurant Corp., ("Debtor"), by its undersigned

attorneys, Hofheimer Gartlir & Gross, LLP, hereby respectfully submits its opposition to the

motion to dismiss Debtor's bankruptcy case and for related relief of landlord Paramount Group,

Inc. as agent for PGREF I, 1633 Broadway Tower L.P. ("Landlord").

<u>**PRELIMINARY STATEMENT**</u>

     1.     Landlord has failed to set forth any grounds that would establish that dismissal of

this case would be in the best interests of the creditors and the estate. To the contrary, each of

Landlord's arguments makes it abundantly clear that dismissal of this case would serve only one

creditor, Landlord, who would stand to recapture a lease worth millions of dollars to it, at the

expense and detriment of the estate and all of the remaining creditors. It is noteworthy that not

one creditor has sided with Landlord's motion to dismiss. Landlord's motion to dismiss should

be denied in its entirety.

## **BACKGROUND**

2.      This Court suggested, on March 26, 2008, when denying Landlord's application

for a preliminary injunction to restrain Debtor from taking any steps to install the cooling tower

that the principal issue on Landlord's motion to dismiss would be the allegation of a bad faith

filing by Debtor.  <u>See</u> the March 26, 2008 Transcript, attached hereto as Exhibit A, at pg. 40

("The issue on the pending motions is primarily one of good faith ....").  This Court opined that

its Order of February 7, 2008 (the "Order"), (i) which denied Debtor's motion to extend the

deadline contained in an order of the Debtor's prior bankruptcy, dated January 20, 2005, that so-

ordered a stipulation dated January 14, 2005 ("Cooling Tower Stipulation"), and (ii) which

denied Landlord's cross-motion to lift the automatic stay, was law of the case. <u>Id.</u> at pg. 5-6

("You lost the motion for a leave from the stay.  You filed a notice of appeal and withdrew it.

That, at least for purpose of today's proceeding, is law of the case as to your right to immediate

possession...[T]he opponent says in its papers, but they suggest as an alternative that it might

well be law of the case, and I think perhaps it is law of the case.").  This Court explicitly held in

the Order that Debtor had the periods available under 11 U.S.C. § 365(b)(1)(A) to cure the

Lease[1] defaults.  Landlord filed a notice of appeal from the Order but chose not to perfect and

pursue that appeal.  It also obtained an extension of time from Debtor to move for

reconsideration, but then chose not to move for reconsideration.  In reliance on Landlord's non-

perfection, Debtor has subsequently expended material sums of money preparing to construct the

cooling tower.

3.      By reason of the analysis made by this Court upon the motion for a preliminary

injunction, Debtor will focus on Landlord's contention that it filed its Chapter 11 petition in

---

[1] Terms such as Lease are defined in Landlord's moving papers.

allegedly bad faith.

**ARGUMENT**

A.  <u>Landlord is Not Entitled to Relitigate Issue of Bad Faith Filing</u>.

4.    This is the <u>second</u> time that Landlord has made the argument that Debtor made a bad faith filing.  Landlord, by its prior counsel, cross-moved on January 24, 2008 to set aside the automatic stay premised on Debtor's alleged bad faith.[2]  <u>See</u> Landlord's (i) Opposition to Debtor's Motion to Extend Deadline pursuant to Rule 9006(b) of the Federal Rules of Bankruptcy Procedure and (ii) Cross-Motion to Lift the Automatic Stay (the "Prior Cross-Motion"), Docket No. 29, attached hereto as Exhibit B, at 28-31.[3]  Landlord made the identical arguments that it makes again on its motion to dismiss.  Landlord argued in the Prior Cross-Motion, as it argues again here, that there was a bad faith filing because "the sole basis for the filing of its bankruptcy case was to prevent termination of its Lease" and there was no indication in the First Day Affidavit that "Debtor was suffering any sort of financial difficulty" at the time of the filing.  Prior Cross-Motion at 29-30.  The Landlord added, as a further emblem of alleged bad faith, that this current filing took place less than three years after the confirmation of the plan of reorganization in Debtor's prior Chapter 11 proceeding.  <u>Id</u>. at 31.  All of these arguments are identical to what Landlord, represented by new counsel, propounds again in the instant motion. The initial threshold issue for the Court is whether Landlord can make in March 2008 the identical arguments that were rejected in February 2008.

5.    This Court, in its Order, denied the Prior Cross-Motion.  The Order necessarily constituted a ruling by this Court that Debtor had not filed in bad faith.  Nothing has changed since February 7, 2008--even Landlord concedes that Debtor is now seriously pursuing

---

[2] Though not specifically referencing sections 1112 and 1127, Landlord moved to lift the stay explicitly based on Debtor's alleged bad faith filing.

[3] All references to "docket numbers" refer to entries on the main case docket unless indicated otherwise.

construction of the cooling tower, Affidavit of Daniel P. Breslin at ¶ 17 ("Breslin Affidavit"), Docket No. 80, which hardly augments Landlord's contention of bad faith.[4]

6.        It is correct that prior counsel for Landlord thought so little of Landlord's bad faith argument that they never mentioned it at the oral argument.  See the January 30, 2008 Transcript attached hereto as Exhibit C.  Since prior counsel, in the exercise of their discretion, decided not to address bad faith in their oral presentation to this Court, the Court, presumably because of this omission by Landlord's counsel, did not mention the bad faith argument in its decision.  Id. at pg. 50-55.  Nevertheless, the Order necessarily rejected Landlord's bad faith contention because this Court denied the Prior Cross-Motion.

7.        The Order constituted a final order.  An order is final if "nothing in the order … indicates any anticipation that the decision will be reconsidered."  In re Adelphia Communications Corp., 333 B.R. 649, 656 (S.D.N.Y. 2005), quoting, United States Trustee v. Bloom (In re Palm Coast, Matanza Shores Ltd.), 101 F.3d 253, 256 (2d Cir. 1996).  "A bankruptcy court's order is 'final' if it completely resolve[s] all of the issues pertaining to a discrete claim, including issue as to the proper relief.'"  Id. (citations omitted).  Courts have held that a bankruptcy court order that denies relief from the automatic stay is a final order.  Adelphia, 333 B.R. at 656, citing In re Worldcom, Inc., Case No. 02-13533, 2005 WL 1208519, at *5 (S.D.N.Y. 2005) (collecting cases).  Landlord recognized that the Order was final by filing a notice of appeal without filing a motion for leave to appeal which is required by appeals of interlocutory orders.  See Fed. R. Bank. P. 8001(b); French Bourekas.Inc. v. Turner, 199 B.R. 807, 816 (E.D.N.Y. 1996) (by filing a notice of appeal but failing to file a motion for leave to appeal, appellant recognized that the Bankruptcy Court order appealed from was a final order).

---

[4] Debtor disputes Landlord's contentions that it first started to seriously pursue the construction post-petition--it has been working on the project for almost a year.

Landlord chose not to perfect its appeal from the Order.[5]  Consequently the Order, which denied

the cross-motion to lift the automatic stay because of a bad faith filing, now has collateral

estoppel effect.  Collateral estoppel bars re-litigation of issues necessarily adjudicated in the prior

proceeding.  See, e.g., Baker by Thomas v. General Motors Corp., 522 U.S. 222, 233 & n. 5

(1998).  At the minimum, the law of the case doctrine also applies to give precedential weight to

the Order.  See, e.g., In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991)("under the law of the

case doctrine, a decision on an issue of law made at one stage of the litigation becomes binding

precedent to be followed in subsequent stages of the same litigation.").  Even if this Court did

not discuss bad faith in its decision, the law of the case doctrine would extend to issues

necessarily resolved.  "Courts apply the law of the case doctrine when their prior decisions in an

ongoing case either expressly resolved an issue or necessarily resolved it by implication."

Kingdom 5KR-41, Ltd. v. Star Cruises PLC, 2005 WL 1863832 (S.D.N.Y. August 8, 2005) at

*4, quoting, Aramony v. United Way of Am., 254 F.3d 403, 410 (2d Cir. 2001).  See also,

Catanzano v. Wing, 103 F.3d 223, 230 (2d Cir. 1996)(law of case doctrine applies to issues

decided by necessary implication).

        8.      It would be ironic to hold that Landlord's tepid advocacy of a bad faith filing

upon the Prior Cross Motion gave it the opportunity to make the identical argument a month

later.  That Landlord saw fit not to press its contention of bad faith at oral argument, leading the

Court to ignore the issue in its decision, should not give Landlord the right to make the same

argument again.  The necessary implication of the denial of the Prior Cross-Motion was that

Debtor's filing was not in bad faith.  Accordingly, the law of the case doctrine precludes re-

litigation of this same issue.

---

[5] As set forth above, Debtor changed its position in reliance on Landlord's decision not perfect this final Order.

B.      On the Merits the Filing was Not in Bad Faith.

9.      If the merits of a bad faith filing are reached, there still is no basis for dismissal. The burden here is on Landlord to demonstrate bad faith.  See In re Century/ML Venture, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003) (the burden is on the movant to prove bad faith).  It is generally accepted that the test for bad faith filing is "if it is clear that on the filing date there was no reasonable likelihood that the Debtor intended to reorganize and no reasonable probability that it would emerge from bankruptcy."  In re C-TC 9th Ave. P'ship, 113 F.3d 1304, 1309 (2d Cir. 1997), quoting, In re Cohoes Indus. Terminal, Inc., 931 F.2d 222, 227 (2d Cir. 1991).  A good faith filing must also be based on a reasonable degree of financial distress.  See In re SGL Carbon, 200 F.3d 154, 162-63 (3d Cir. 1999); In re Schur Mgmt. Co. Ltd., 323 B.R. 123, 126-27 (Bankr. S.D.N.Y. 2005).  Conversely, dismissal for lack of good faith "is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."  In re 68 West 127 Street, LLC, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002).  See also Schur Mgmt., 323 B.R. at 126.

10.      The mere fact of a second filing does not require dismissal nor indicate a lack of intent to reorganize and emerge from bankruptcy.  Nothing in the Bankruptcy Code prohibits a second Chapter 11 filing.  See, e.g., Johnson v. Hane State Bank, 501 U.S. 78 (1991).  Had Congress desired to prevent second filings in the circumstances at bar, it would have so provided in the Code.  See, e.g., 11 U.S.C. § 109(g) (demonstrating that Congress knew how to draft a provision to prevent an entity from filing a second bankruptcy).

11.      In fact, a second Chapter 11 filing is so common that the term "Chapter 22" has become commonplace.  A study published in 2003 found that between 1995 and 2001, 55 public companies re-filed for bankruptcy.  See John Yozzo and Randall S. Eisenberg, Rethinking

WACC in Estimating Reorganization Value, 22-Aug Am. Bankr. Inst. J. 38, 39 (2003).  These

55 re-filings represented at least 19 percent of the 295 public companies that emerged from

bankruptcy between 1992 and 1998.  Id.  The percentage of refilings almost certainly are higher

for non-public companies.  Other commentators have noted that the recidivism rate under

Chapter 11 is as high as forty-two percent in some districts.  See Harvey R. Miller and Shai Y.

Waisman, Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses

for the Twenty-First Century?, 78 Am. Bankr. L.J. 153, 188 (2004), citing Harvey R. Miller &

Shai Y. Waisman, The Creditor in Possession, 21 No. 1 Bankr. Strategist 1, 4 (2003).  There are

multiple prominent examples of second Chapter 11 filings throughout the nation.  See, e.g., U.S.

Airways, Continental Airlines, Jamesway, The Wiz, McCrory's, Levitz (three times), Seaman's,

Malden Mills Industries, Aloha Airlines, Tower Records, American Banknote, Wherehouse

Entertainment, Inc., Today's Man, Eagle Food Centers, Penn Traffic, Midway Airlines, Payless,

Crown Books, Ames Department Stores, Trans World Airlines (three times), Frontier Holdings,

Pan Am Corp. and Braniff Airlines.

      12.    Underlying Landlord's allegation of bad faith filing appears to be § 1127(b).

Nothing in § 1127(b) prohibits refilings.  This issue of an alleged bar on serial filings was

reviewed in In re Jamesway Corp., 202 B.R. 697, 705-706 (Bankr. S.D.N.Y. 1996).  The

Jamesway court wrote:

> "Underlying Landlord's arguments is their contention that
> permitting Jamesway to engage in serial filings circumvents
> remedies provided in the Bankruptcy Code for failed
> reorganizations and its proscription under § 1127 of modifications
> to the terms of a plan that has been substantially consummated.  In
> limited instances, courts dismiss serial bankruptcy filings on bad
> faith or similar grounds.  [citations omitted]  Absent conduct
> amounting to bad faith, serial chapter 11 filings are generally
> allowed.  See, e.g., Jartran, 886 F.2d at 869 ("[t]he Code clearly by
> its terms permits serial good faith Chapter 11 filings, even where

the effect is to circumvent protections generally afforded creditors under the Code's provisions for failed reorganizations"); Elmwood Development Co. v. General Electric Pension Trust (in re Elmwood Development Co.), 964 F.2d 508, 511 (5th Cir.). ("the national consensus permit [s] serial filings in Chapter 11 cases provided the second petition was filed in good faith")(citing cases), reh'g denied, 974 F.2d 1337 (5th Cir. 1992); United States v. Conston, Inc. (In re Conston, Inc.), 181 B.R. 769, 772 n. 4 (D.Del. 1995) ("although Congress did not expressly enumerate serial Chapter 11 filings as a viable [plan] post-default option, the courts have general permitted them")(citing cases)."

See also In re Jartran, 886 F.2d 859, 866 (7th Cir. 1989) ("Serial Chapter 11 filings are permissible under the Code if filed in good faith").

13.     There is no showing of bad faith here.  Most important, Debtor was in genuine financial distress.  Its petition reveals that it had approximately 65 creditors and that it had liabilities of $3,011,004.49 as compared to assets of only $809,400.  See Petition and Amendment thereto, Case No. 07-14062, Docket Nos. 1 & 40.  To meet the obligation to install the cooling tower, Debtor has been obligated to obtain additional outside funds, to wit: $600,000 in cash and a pledge from its investors to finance any deficiency in funds for the construction of the cooling tower.  See Exhibit D.  Contrary to the argument made by Landlord in the Prior Cross-Motion, Debtor's Petition and Amendment demonstrates that it was insolvent when it filed the petition.  With Debtor's liabilities exceeding its assets by over two million dollars, Debtor had more than sufficient cause to file.

14.     Debtor is not seeking to modify the Cooling Tower Stipulation -- this Court denied its application to modify this stipulation to extend the deadline contained therein.  Debtor is abiding by the prior plan of reorganization, even if it needs the periods provided by § 365 of the Code to cure its alleged historical default under the Cooling Tower Stipulation.  See January 30, 2008 Transcript, attached hereto as Exhibit C, at pg. 26-27, 52-53.  Consequently, this second

filing will not be a bad faith effort to alter the plan of reorganization entered in the first filing as there will be no material change of the prior plan. Most notably, Debtor has occupied the premises for nine years without any discernable need for this additional air conditioning equipment. Landlord has presented no evidence of harm caused by the delay.[6] First, it made a naked and conclusory claim that it lost tenancies by reason of the lack of this cooling tower. See Prior Cross-Motion, attached hereto as Exhibit B, at 6. Now, Landlord implicitly concedes that this initial claim was a fiction, by instead claiming merely that it has lost the ability to sell additional air conditioning to unnamed tenants. See Response and Objection of Landlord to the Debtor's Motion to Extend Time to Assume or Reject Unexpired Non-Residential Real Property Lease ("Landlord's Response and Objection") at 6-7, Docket No. 88.

15.    Debtor's first filing was in 2002 and was caused by the tremendous adverse impact of the September 11 attacks on business in the theatre district. Market conditions failed to bounce back as Debtor had expected after the first filing. As further evidence of Debtor's tenuous financial position after the first bankruptcy was closed, Debtor required three infusions of cash between October 2005 and September 2006 totaling one million dollars. The country appears to have slipped again into a recession at the end of 2007. In the meantime, Landlord in 2007 initiated several attempts to terminate the Lease.

16.    On March 1, 2007, Landlord served Debtor with a three day notice to cure (the "First Notice to Cure") alleging that Debtor was in default under the Lease for hosting late-night functions at the premises. The First Notice to Cure was served notwithstanding the fact that the same type of functions had been taking place since 2002; notwithstanding the fact that Debtor

---

[6] It was always contemplated that the process of installing the Cooling Tower would not commence until the beginning of 2007, and the Landlord had agreed to such schedule. See Cooling Tower Stipulation attached hereto as Exhibit E. That Landlord in 2005 was willing to wait over two years for the installation of the cooling tower belies Landlord's claims of immediate harm and loss caused by a short additional delay.

had always given Landlord prior notice of all functions; notwithstanding the fact that Landlord had not objected to any of the allegedly violative functions; notwithstanding that the parties agreed in the first bankruptcy to limit only two types of function (hip-hop and rap), and, most important, notwithstanding that Debtor assumed the Lease, with Landlord's consent, at a time when Debtor held the same type of functions it holds today (which do not include the proscribed rap/hip-hop functions).

17.     Debtor moved for and obtained an order of the Supreme Court of the State of New York, County of New York (Index No. 102995/07), dated July 18, 2007, granting it a Yellowstone injunction prohibiting Landlord from terminating the Lease. The Court found that the First Notice to Cure was "facially insufficient and defective." Landlord appealed but, after serving a second notice to cure (the "Second Notice to Cure") in the same action, withdrew its appeal.

18.     On or about May 24, 2007, Landlord served a default letter on Debtor alleging that it did not have sufficient insurance coverage as required by the Lease. Landlord asserted that the insurance coverage must be increased from $5 million to $100 million, an amount far in excess of the norm. Debtor asserted its right to arbitrate the issue as provided by the Lease. Debtor voluntarily increased its insurance coverage to $20 million, and Landlord never responded to Debtor's demand to arbitrate.

19.     On August 23, 2007, Debtor received the Second Notice to Cure from Landlord making nearly identical allegations as the First Notice to Cure. Debtor was required to obtain a second Yellowstone injunction with regard to the Second Notice to Cure, which was issued on August 27, 2007 under the same index number as the first Yellowstone injunction.

20.     Landlord's notices to cure were based on distorted, if not false, descriptions of the functions held at the Premises, including unfounded allegations of drug use and assaults perhaps caused by the operation of Landlord's 24-hour, seven day a week garage.  Further, Landlord's own agents actually smuggled a gun into the restaurant in an attempt to discredit Debtor.

21.     Landlord's actions succeeded in derailing Debtor's plans to install the cooling tower in early 2007, since its service of the meritless notices to cure and default notices frustrated Debtor's ability to finance the installation of the cooling tower by engendering uncertainty over the status of the Lease and Debtor's ability to remain in business.  Landlord chilled the ability of Debtor to obtain the necessary outside financing to build the cooling tower. Landlord's actions also caused Debtor to incur tens of thousands of dollars in unanticipated legal fees, further weakening Debtor's financial condition.

22.     By its own actions, Landlord itself appears to be contesting a stipulation that it entered into with Debtor in the prior proceeding.  See November 6, 2002 Stipulation, attached hereto as Exhibit E.  Debtor and Landlord agreed that the following types of parties would no longer be held at the premises:

> "…in no event shall the Debtor be permitted to host any Events[7] such as the "Planet Rock" functions sponsored by various popular radio stations, including Power 105.1, or other functions substantially similar in nature to the Events regardless of the type of music or theme of the function."

Id.  Landlord served the aforementioned notices of default in 2007 that claimed that all parties were banned under the Lease, even though it had allowed Debtor to assume the Lease in the initial bankruptcy proceeding with the knowledge that the Debtor was continuing to hold parties

---

[7] "Events" is defined in the November 6, 2002 stipulation as "certain hip-hop/rap special functions, including, without limitation the "Planet Rock" functions and other events sponsored by the Power 105.1 radio station."

other than those proscribed by the November 6, 2002 Stipulation.

23.     These changes of circumstances demonstrate Debtor's lack of bad faith in filing the instant petition because it was not foreseeable after this first filing that Landlord would seek to subvert Debtor's reorganization.

24.     At no time has Debtor ever stated that the Cooling Tower Stipulation was the sole reason for its filing.  Debtor does not deny that the cooling tower obligation played a significant role in its determination to file.  It was this million dollar obligation when combined with Debtor's financial obligations from its first bankruptcy, unanticipated expenses and legal fees in fighting Landlord's notices of default, together with Debtor's weakened financial condition and inability to obtain additional financing when its Lease was threatened, that caused Debtor to file the instant case.  Termination of the Lease would have put Debtor out of business.  Debtor's reaction to this imminent threat to its existence is not bad faith.  In In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999), the Third Circuit found that a Chapter 11 filing in response to the filing of a suit was premature because the possibility of an adverse judgment causing financial ruin did not suffice as a basis for filing bankruptcy.  Id. at 163, 168-69.  The court wrote that the situation would be different if a judgment had been entered threatening debtor's existence.  Id. at 168. The possible imminence of the termination of Debtor's business here would be a basis under SGL Carbon to find good faith, not the opposite.

25.     Unlike SGL Carbon, there is no showing that Debtor here was financially healthy. It did not have the funds necessary to build the cooling tower.  Even if this obligation were ignored, its debts substantially exceeded its assets.

26.     This Court has already held that Debtor will have an opportunity to cure its default under the Lease pursuant to Section 365.  Consequently, Landlord has no basis to assert

that debtor has no reasonable probability of emerging from bankruptcy and no realistic chance of reorganizing. In re C-TC. 9th Avenue Partnership, 113 F.3d 1304, 1310 (2d Cir. 1998). Debtor is working diligently to build the cooling tower. It is highly probable that Debtor will be able to reorganize and emerge from bankruptcy. Reorganization is in the best interests of Debtor and its creditors. See SGL Carbon, 200 F.3d at 168. Termination of the Lease will be devasating to all of Debtor's trade creditors and all of its employees. Debtor here is equivalent to:

> financially troubled debtors that seek in good faith to avoid a preclusive judgment in State Court that would prejudice legitimate efforts to preserve value for the benefit of all of their creditors.[4]
>
> _____
>
> [4] For example, many financially troubled debtors file a Chapter 11 petition before the action of the State court results in the termination of a lease or other property right that may be critical to their ability to reorganize for the benefit of their creditors.

In re Schur Mgmt., 323 B.R. at 128. Here the preservation of the Lease is critical to Debtor's survival. Debtor's efforts to preserve its Lease for the benefit of itself, its creditors and its employees demonstrates its good faith.

27.     Landlord's own principal case regarding bad faith, In re Casse, 198 F.3d 327 (2d Cir. 1999), supports Debtor's position. In Casse, the debtors were individuals who made three filings within five and a half years to frustrate foreclosure proceedings on their home that had been instituted in state court. The second filing was made 14 months after the debtors were granted a discharge in the first bankruptcy and the third filing was made one year after the second filing. In reviewing each of the filings, the Second Circuit noted that the debtors took no meaningful actions to advance their cases.

28.     Here, by contrast, the filings were over five years apart by a debtor that is an operating business with approximately 180 employees and several million dollars in revenue

each year.  It should be noted that Debtor's sales are up from this time last year and tour groups, schools, summer camps, and other social organizations have scheduled over 500 events and parties to "Mars" during the next five months.  Since the petition date, the Debtor has performed each and every obligation required of it by both this Court and Office of the United States Trustee.  Moreover, Debtor is continuing to proceed with the construction of the cooling tower despite Landlord's arguments to the contrary.  It is anticipated that Debtor will be able to exit this Chapter 11 proceeding as an operating entity by late 2008 or early 2009.

29.      Notably, of the approximately 65 creditors, Landlord is the only (albeit contingent and disputed creditor that may even lack standing) to object to the Debtor's petition.  In fact, Debtor's principal secured creditor, Rewards Network, has advised that it intends to file a statement in support of Debtor and in opposition to Landlord.  It is not in the best interests of Debtor, the estate, or the creditors for the Court to grant the relief that Landlord seeks because dismissal would provide no opportunity for Debtor's creditors to recover what they are owed.

30.      None of the other cases or bad faith cited by Landlord are on point.  It is instructive that Landlord could cite not a single case concerning or operating business and that all its cases concern individuals whose homes were subject to foreclosure proceedings.[8]

---

[8] In re Woodbrook Assocs., 19 F.3d 312 (7th Cir. 1994) (single asset real estate case that was dismissed because of inability to propose a plan that could be accepted over an undersecured creditor's objection); In re 3 Ram, Inc., 343 B.R. 113 (Bankr. E.D. Pa. 2006) (Individual filed Chapter 13 to stave off foreclosure and then filed Chapter 11 for non-operating corporation that he controlled in order to protect its sole asset from being used to satisfy a judgment. Sole creditor sought dismissal because the debtor would not be able to effectuate a plan.).  Landlord uses these latter two cases to buttress its argument that certain pre-BAPCPA clauses in section 1112 should apply to the instant case. In re Feldman, 309 B.R. 422 (Bankr. E.D.N.Y. 2004) (The debtors filed two Chapter 13 cases and one Chapter 7 case in less than two years in order to prevent foreclosure of their home.  The mortgagee, a secured creditor, was granted relief from the automatic stay and the court held that it had the power to grant prospective relief.); In re Hamer, No. Civ. A 00-1180, 2000 WL 1230496 (E.D. Pa. Aug. 18, 2000) (The debtors filed three Chapter 13 cases in three years to prevent foreclosure of their home.  The mortgagee, a secured creditor, was granted relief from the automatic stay and prospective relief in future filings by the debtors.); In re Rowe, 239 B.R. 44 (Bankr. D.N.J. 1999) (The debtors filed one Chapter 7 case and two Chapter 13 cases in three years to prevent foreclosure of their home. The mortgagee, a secured creditor, was granted relief from relief from the automatic stay and prospective relief from the automatic stay in the event of future filings by the debtors.); In re Felberman, 196 B.R. 678 (Bankr. S.D.N.Y. 1995) (The debtors filed three successive Chapter 13 cases in order to stave off foreclosure of their home.); In re

C.     Section 1127(b) is Not a Basis to Dismiss This Bankruptcy.

31.     New counsel for Landlord has seized upon Section 1127(b) of the Code, as a basis for a so-called new argument overlooked by prior counsel.  In fact, other than citing to § 1127(b), the argument made by new counsel is identical to the argument made by Landlord, represented by prior counsel, on the Prior Cross-Motion.  Landlord concedes, as it must, that the Cooling Tower Stipulation is part of the Lease.  See Breslin Affidavit at 1 n 1, Docket No. 80. Nevertheless, both on its Prior Cross-Motion and again upon this motion to dismiss, Landlord asserts that under § 365 of the Code, Debtor has no opportunity to cure this default.  It asserts that to allow Debtor to cure the default would be tantamount to an amendment of the Cooling Tower Stipulation.  Because this Cooling Tower Stipulation was so-ordered by the Court in the prior filing and incorporated in the prior plan of reorganization, the Landlord has consistently maintained that to allow Debtor to cure under § 365 would constitute an inappropriate modification of a Court order and a plan of reorganization.  Since the default is allegedly incurable, a proposition strenuously disputed by Debtor, Landlord has repeatedly contended that the Lease is not property of the bankruptcy estate.

32.     Landlord has simply re-packaged the identical arguments made in its Prior Cross-Motion in the hope that this Court will change its mind.  Landlord, in its Prior Cross-Motion, previously argued that the Cooling Tower Stipulation was the equivalent of a final judgment. Prior Cross-Motion at 20.  It stated that Debtor had no right to modify this order.  Landlord further devoted a section of its Cross-Motion papers to argue that § 365 of the Code did not

---

Abdul-Hasan, 104 B.R. 263 (Bankr. C.D. Cal. 1989) (The debtor filed three Chapter 13 cases in a 16 month period after defaulting on plan payments in the first Chapter 13 case in order to avoid foreclosure of their home.  The debtors had also received a discharge in Chapter 7 several years earlier.  The mortgagee, a secured creditor, was granted relief from the automatic stay based on order from previous Chapter 13 case that set forth prospective relief from the automatic stay.); In re Greenburg, 200 B.R. 763 (Bankr. S.D.N.Y 1996) (The debtor filed two Chapter 13 cases within one year in order to prevent foreclosure by her coop.)

prevent the Lease from terminating on December 31, 2007.  Prior Cross-Motion at 15-17.  In

response, this Court held that Debtor could not modify the Cooling Tower Stipulation, but that

the opportunity to cure an historical default under § 365 did apply to this provision of the Lease,

notwithstanding that this provision is contained in a so-ordered stipulation filed in a prior

proceeding.  <u>See</u> the January 30, 2008 Transcript, attached hereto as Exhibit C, at pg. 50-55.  As

previously set forth, this unappealed Order is a final order and is entitled to <u>res</u> <u>judicata</u> and

collateral estoppel effect.  Although this Court was not willing to subscribe to that view upon

Landlord's application for a preliminary injunction, it did opine that the law of the case doctrine

would apply.  <u>See</u> the March 26, 2008 Transcript, attached hereto as Exhibit A, at pg. 5-6.  This

Court further instructed the parties that it had determined that Debtor did have an interest in the

Lease and would be entitled in accordance with § 365 of the Code to cure its historical default of

not having built the cooling tower by December 31, 2007.  <u>Id.</u> at pg. 40; <u>see also</u>, the March 12,

2008 Transcript, attached hereto as Exhibit G, at pg. 7.

33.    Based on the unappealed final Order of this Court, the Debtor has diligently

pursued construction of the Cooling Tower.  It has signed a contract to fabricate this equipment,

a separate contract to install it, and it has hired an architect and an acoustician.[9]  Debtor has

spent over $100,000 to install the Cooling Tower since the end of February (<u>i.e.</u> since Landlord's

appeal time expired).[10]  Landlord has no right now to collaterally attack the Order.  If it wanted

---

[9] Post-petition, Debtor hired Smith-McCord, Inc. a well-known regional general contractor, because its bid for
construction of the cooling tower was $400,000 less than other bids.  Smith-McCord has performed work for major
Fortune 500 companies, including four current projects in Manhattan, and works for a multi-billion dollar retailer in
the region.  Pre-petition, the Debtor had hired Plaza Construction Corp. and Cosentini to work on this project.

[10] Despite Debtor's good faith efforts to proceed, post-petition Landlord has continued its frustration tactics and has
sought to impose additional obligations on Debtor that have no basis under the law, the Lease, or the Cooling Tower
Stipulation.  Landlord refused to sign Debtor's permit applications.  Since the hearing on March 26, 2008, Landlord
has not responded to multiple requests for walk-throughs with Debtor's construction consultants and has refused to
answer questions about the building posed by these consultants.  These issues will be discussed in greater detail in
Debtor's forthcoming reply in further support of its motion to extend the time to assume the Lease pursuant to
section 365(d)(4) and the declaration of Mary Hanlon in support of this motion.

to challenge the Order, Landlord should have pursued its appeal.

34. The actual merits under § 1127(b) should not even be reached. To the extent they are, Landlord's argument is off-base. Debtor is no longer contending that the Cooling Tower Stipulation should be modified. This Court has already rejected that contention. Section 1127(b) is irrelevant when, as here, Debtor is not seeking any relief from an order and plan of reorganization filed in the prior bankruptcy. This Court has ruled in Debtor's favor that Debtor has the right to cure defaults under the Lease within the periods allowed under 11 U.S.C. § 365. The fact that the Cooling Tower Stipulation, which Landlord concedes is a component of the Lease, was so-ordered by this Court and included in the prior plan of reorganization in the prior bankruptcy does not immunize this Lease term from § 365. Based on Landlord's flawed logic, a breach of an assumed executory contract or unexpired lease encompassed in a plan of reorganization in a previous bankruptcy could not be cured if that debtor filed again. Landlord can cite no authority whatsoever for its far-reaching contention that § 365 is irrelevant if the contractual provision at issue was encompassed in a prior so-ordered stipulation and a plan of reorganization filed in a separate and distinct prior bankruptcy proceeding.

35. As previously established nothing in § 1127(b) prevents second filings. See 7 Collier on Bankruptcy ¶ 1127.04[4]. Were Landlord's contentions, already rejected once by this Court, now accepted, the ability of a debtor to file a second bankruptcy and to rehabilitate itself would be severely compromised.

36. Even were § 1127(b) applicable, there is an exception for extraordinary circumstances. See generally 6 Norton Bankr. L. & Prac. 3d. § 111:4 (2008). Although there should be no need to reach that issue, Landlord's interference with Debtor's ability to finance the cooling tower (which appears to be continuing post-petition) could be deemed an extraordinary

circumstance under which Debtor could seek to modify the prior plan of reorganization. The Court, pursuant to section 105 of the Bankruptcy Code, could also do so <u>sua</u> <u>sponte</u> if necessary to preserve this proceeding. In addition, Landlord's attempt to prevent Debtor from erecting the tower, after having lived without it for 10 years, suggests that Landlord does not need this equipment. Landlord has taken the position that it is irrelevant whether or not it needs the cooling tower because that obligation is embodied in a Court order and in a plan of reorganization. If the cooling tower is superfluous, it would certainly constitute an extraordinary circumstance that could allow modification of the plan of reorganization of the prior bankruptcy proceeding to eliminate this obligation of Debtor.

D.     <u>Landlord's Other Contentions Have No Merit</u>.

37.     Landlord also alleges that sections 1112(b)(4)(E) (failure to comply with a court order) and (b)(4)(N) (material default with respect to a confirmed plan) are applicable. On its face these sections are not applicable because section 1112 refers to actions in present proceedings not prior proceedings.

38.     Even so, Debtor complied with the confirmation order of the prior bankruptcy. Likewise, Debtor is not in material default of the confirmation order or the confirmed plan as it made all payments under the plan in the prior bankruptcy. Indeed, Landlord offers no support for the proposition that the Court, in this proceeding, can make a determination of compliance pursuant to subsections (b)(4)(E) and (b)(4)(N) with the prior confirmation plan and Cooling Tower Stipulation, which were entered in a prior proceeding. At most, Debtor breached the Cooling Tower Stipulation, a component of the Lease, which is part of an executory contract for nonresidential nonshopping center real property that is subject to cure under § 365. These arguments under (b)(4)(E) and (b)(4)(N) are substantially identical to Landlord's arguments

under § 1127(b) and its arguments made in the Prior Cross-Motion. The Landlord has not provided any ground for this Court to depart from its prior decision.

39. To the extent cause exists under sections 1112(b)(4)(E) and (b)(4)(N), section 1112(b)(2) creates an exception to 1112(b)(1) that would prohibit dismissal. See 7 Collier on Bankruptcy ¶ 1112.04[3]. Section 1112(b)(2) provides in pertinent part that:

> absent unusual circumstances, the court must not convert or dismiss the case if (1) there is a reasonable likelihood that a plan will be confirmed within the timeframes specified in subsection 1112(b)(2), (2) the grounds for converting or dismissing the case include an act or omission by the debtor other than substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation and (3) there exists a reasonable justification for the act or omission, and the act or omission will be cured within a reasonable time fixed by the court.

See 7 Collier on Bankruptcy ¶ 1112.04[3] (emphasis in original). For the reasons set forth above with respect to Landlord's actions, Debtor would be entitled to cure under section 1112(b)(2).

40. Landlord also asks again for relief from the automatic stay so that it can evict Debtor. This is precisely the same motion that Landlord made previously, which this Court denied in the Order. Res judicata bars this duplicative application. See, e.g., EDP Medical Computer Systems, Inc. v. U.S., 480 F.3d 621, 624 (2d Cir. 2007) (stating that the doctrine applies with equal force to bankruptcy matters). The Court should not even have to reach the issue of whether collateral estoppel and law of the case would bar this application in the event res judicata is inapplicable.

41. Curiously, in support of that part of its motion that seeks to lift the automatic stay and grant prospective relief from the automatic stay Landlord cites cases that all concern individual debtors. It cannot cite a single case that pertains to reorganization of an operating business. All of Landlord's cases have previously been distinguished. See n.8, supra.

WHEREFORE, Debtor respectfully requests that the Court (i) deny the instant motion of Landlord to dismiss the petition or to set aside the automatic stay, and (ii) grant such other and further relief as this Court deems just and proper.

Dated: April 4, 2008
New York, New York

HOFHEIMER GARTLIR & GROSS, LLP
Counsel for the Debtor and Debtor-in-Possession

By:
/s/Scott R. Kipnis
Scott R. Kipnis (SK-9147)
Douglas Gross (DG-5984)
Nicholas B. Malito (NM-3216)
530 Fifth Avenue
New York, NY  10036
(212) 818-9000